## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TERRY HERSHBERGER,<br><br>    Plaintiff,<br><br>    v.<br><br>LIBERTY LIFE ASSURANCE OF BOSTON,<br><br>    Defendant. | CIVIL ACTION NO. 1:13-CV-02795<br><br>(KANE, J.)<br>(MEHALCHICK, M.J.) |

## REPORT AND RECOMMENDATION

This is an action for benefits under the Employment and Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* This matter is before the Court on the parties' cross-motions for summary judgment. (Doc. 11; Doc. 14). For the reasons that follow, it is recommended that the defendant's motion be granted and the plaintiff's motion be denied.

I. **BACKGROUND**

The material facts of this case are largely undisputed.

The Plaintiff, Terry Hershberger, worked for BJ's Wholesale Club, Inc., from 1991 to 2009 as a butcher and meat manager. As a full-time salaried employee, he was insured under a Group Disability Income Policy (the "Policy"), issued by the Defendant, Liberty Life Assurance of Boston ("Liberty"), and effective January 1, 2009. (Doc. 20-1). The Policy provides long-term disability benefits to full- and part-time salaried employees of BJ's Wholesale Club.

Hershberger ceased work on December 27, 2009. He received short-term disability

benefits during a 90-day elimination period[1] before becoming eligible for payment of long-

term disability benefits on March 27, 2010. He then received long-term disability benefits for

two years under the Policy's "own occupation" period of disability coverage. On February

17, 2012, after reviewing Hershberger's medical treatment records and obtaining peer review

reports from consulting physicians, Liberty issued a determination discontinuing

Hershberger's benefits effective March 27, 2012, on the ground that he was not disabled

under the Policy's "any occupation" period of disability coverage. Hershberger pursued an

administrative appeal from this decision, which was denied on October 1, 2012, following

additional review of his medical records and additional peer review reports by consulting

physicians.

    A. THE POLICY

    The Policy provides a general definition of "disability," which states:

> "Disability" or "Disabled" means that during the Elimination Period and the
> next 24 months of Disability the Covered Period, as a result of Injury or
> Sickness, is unable to perform the Material and Substantial Duties of his Own
> Occupation; and . . . thereafter, the Covered Person is unable to perform, with
> reasonable continuity, the Material and Substantial Duties of Any
> Occupation.

(Doc. 20-1, at 2).

"'Own Occupation' means the Covered Person's occupation that he was performing when

his Disability . . . began." (Doc. 20-1, at 13). "'Any Occupation' means any occupation that

the Covered Person is or becomes reasonably fitted by training, education, experience, age,

---

[1] "[M]ost disability insurance includes a provision for an 'elimination period,'
specifying that benefits are not payable at all unless and until the insured has been
continuously disabled for the specified period. Most major employers have sick days or
similar benefits that operate to keep an employee's salary steady during at least some part of
the elimination period . . . ." 12 Steven Plitt et al., *Couch on Insurance* § 182:10 (3d ed. 2014).

physical and mental capacity." (Doc. 20-1, at 8). "'Material and Substantial Duties' means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." (Doc. 20-1, at 12).

If the covered person is deemed "Disabled" under the Policy, Liberty is obligated to pay him a monthly benefit equal to 60% of his monthly earnings from BJ's Wholesale Club, less any other earnings or benefits, such as Social Security disability insurance benefits. (Doc. 20-1, at 5; Doc. 20-1, at 23; Doc. 20-1, at 28–29).

The Policy also provides that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (Doc. 20-1, at 39).

## B. THE PLAINTIFF'S DISABILITY CLAIM

At the time when he ceased working on December 27, 2009, Hershberger was already being treated for several health conditions, including bicuspid aortic valve, aortic insufficiency, dilated ascending aorta, small vessel coronary disease, diastolic dysfunction, hypercholesterolemia, sleep apnea, and diabetic peripheral neuropathy. In addition to his treating physician, Robert Matsko, D.O., Hershberger was being followed by a treating cardiologist, Keith Rice, M.D., a treating neurologist, Maria Michalek, M.D., and a treating podiatrist, Jeffrey A. Marks, D.P.M.

On December 27, 2009, Hershberger was admitted to a hospital with an infected toe, a blood infection, and cellulitis (inflammation of subcutaneous tissue) extending up to his groin. He previously had been diagnosed with and treated for diabetes with peripheral neuropathy (nerve damage in his feet), the practical result of which was that he had begun

developing ulcers on his toes due to diminished sensitivity while wearing boots in a refrigerated area.[2] Hershberger was treated with antibiotics and followed up with his treating podiatrist, Dr. Marks, for further treatment. (Doc. 20-2, at 22; Doc. 20-12, at 41). On January 22, 2010, after the foot ulcers had healed, Dr. Marks performed surgery on Hershberger's right foot to remove an "extreme" bone spur and restore function to a fused joint. (Doc. 20-12, at 42–43). Dr. Marks continued to treat Hershberger, including later incidents involving injuries to his feet and toes due to his "profound neuropathy." (Doc. 20-12, at 39–40; Doc. 20-4, at 42–50). On April 2, 2012, Dr. Marks provided Liberty with a letter stating his medical opinion that:

> [Hershberger] has had ongoing issues with ulcerations and it seems that no matter what preventative measures we take, he continues to have problems. The only solution that we have come to for him is to have him cease employment. From our standpoint, there is really no job function he can perform safely without causing openings to his feet. We have tried both conservative and surgical measures.

(Doc. 20-3, at 24).

Subsequently, Dr. Marks spoke with Ira M. Fox, D.P.M., a consulting podiatrist retained by Liberty as a peer reviewer. Dr. Marks clarified that, "while he felt the claimant was unable to return to his old occupation," which required "standing and walking in a cold freezer that caused several episodes of foot ulcerations," Hershberger "certainly was capable of working at a sedentary to light [physical demand level]." (Doc. 20-3, at 8).

Hershberger had been seeing his treating cardiologist, Dr. Rice, since March 2006 for a variety of cardiac and pulmonary conditions. (Doc. 20-9, at 16). In his March 4, 2010,

---

[2] Dr. Marks had treated Hershberger for "repeated ulcerations and subsequent infections," since 2004. He had also removed bone spurs on more than one occasion. (Doc. 20-3, at 23).

treatment notes, Dr. Rice noted his opinion that, due to these conditions, Hershberger "may end up requiring long-term disability given his multiple cardiovascular issues." (Doc. 20-10, at 29; Doc. 20-12, at 14). In his April 9, 2010, treatment notes, Dr. Rice noted that Hershberger's "work requires him to not only lift heavy objects but also uses arms all day long which I believe is not feasible given his coronary disease. He has applied for and been granted long-term disability which I believe is the correct choice." (Doc. 20-8, at 8; Doc. 20-11, at 13). On May 28, 2010, Dr. Rice spoke with Raye L. Bellinger, M.D., a consulting cardiologist retained by Liberty as a peer reviewer. In that conversation, Dr. Rice expressed his opinion that Hershberger "could perform a sedentary level occupation," but that "light or more stressful work may be hazardous for him." (Doc. 20-10, at 14). On December 21, 2010, Dr. Rice completed a restrictions form in which he provided his medical opinion that Hershberger was limited to work that did not require him to lift, push or pull more than ten pounds. (Doc. 20-9, at 16). In his March 5, 2012, treatment notes, Dr. Rice noted his opinion that: "I do not believe he is able to perform a job that requires strenuous activity or outside work given his cardiac condition." (Doc. 20-3, at 28). In his April 13, 2012, treatment notes, Dr. Rice noted his opinion that: "Given his cardiac issues I do not believe he can perform any outdoor activity or strenuous activity such as lifting more than 15 pounds for any prolonged period of time." (Doc. 20-3, at 26).

Hershberger had also been seeing his treating neurologist, Dr. Michalek, since February 2009 for the treatment of moderate obstructive sleep apnea with REM-related hypoxia. (Doc. 20-9, at 35–36). Sleep studies performed on February 10, 2009, and February 24, 2009, confirmed that Hershberger suffered from obstructive sleep apnea associated with severe hypoxia, and that his condition was improved with CPAP therapy.

(Doc. 20-9, at 38–39; Doc. 20-10, at 26–27). In a May 2009 follow-up examination, Dr. Michalek noted that Hershberger was responding "very well to CPAP therapy" and his condition had "dramatically improved." (Doc. 20-9, at 37). On March 3, 2010, Dr. Michalek completed a restrictions form in which she provided her medical opinion that Hershberger was limited to sedentary work for an indeterminate period of time due to a combination of conditions — severe obstructive sleep apnea, obesity, severe peripheral polyneuropathy, and an ulcer on a toe on his left foot. (Doc. 20-12, at 46). Dr. Michalek subsequently[3] completed another restrictions form conveying the same opinion — that Hershberger was limited to sedentary work due to his combination of health conditions. (Doc. 20-10, at 25). On March 14, 2012, Dr. Michalek provided Hershberger with a letter reciting his three-year treatment history with her, noting that he "continues to experience episodes of dyspnea and overall fatigue" and "is easily tired and dyspneic." (Doc. 20-3, at 33). The letter noted Dr. Michalek's opinion that: "Mr. Hershberger has multiple medical issues which do not allow him to return to work as a butcher and manager at BJ's or any other type of employment/job. This is related to his diabetes mellitus, coronary artery disease, peripheral polyneuropathy, ascending aortic aneurysm, moderately severe obstructive sleep apnea." (Doc. 20-3, at 34). On several occasions, Dr. Michalek failed to respond when contacted by various consulting physicians retained by Liberty as peer reviewers. (Doc. 20-3, at 1; Doc. 20-3, at 49; Doc. 20-5, at 43).[4]

_____

[3] The date of the second restrictions form is unclear. The document in the administrative record is hand-dated June 27, 2010, but also bears fax headers dated April 22, 2010, and May 3, 2010.

[4] It should be noted, however, that one of these several attempts to contact Dr. Michalek came at a time when her office was closed due to flooding.

Dr. Matsko was Hershberger's primary care physician at the outset of his period of disability. In May 2011, Dr. Matsko was succeeded as Hershberger's primary care physician by Babak Behta, M.D., a physician in the same practice. Sometime between November 2011 and March 2012, Dr. Behta appears to have been succeeded by Martin J. Wall, D.O, a physician in the same practice as well.[5] On April 2, 2012, Dr. Wall provided Liberty with a letter, stating that:

> Mr. Hershberger has a significant past history of uncontrolled diabetes, coronary artery disease, peripheral neuropathy, ascending aortic aneurysm, sleep apnea, stage 3 chronic kidney disease, [right] eye multiple visual losses due to hemorrhage, & retinopathy. He also suffers from compensated congestive heart failure
>
> He fatigues easily & continues to get chest pain at times. His specialists do not want him to exert himself. Due to my patients poor health in my medical opinion he is fully & permanently disabled.
>
> (Doc. 20-3, at 38).

On August 28, 2012, Dr. Wall spoke with Albert C. Fuchs, M.D., a consulting internist retained by Liberty as a peer reviewer. In that conversation, Dr. Wall expressed his opinion that Hershberger "could [not] return to work even at a sedentary level. . . . [Hershberger] could not sit for a prolonged period of time because of his lower extremity edema and that he could not concentrate because of fatigue caused by his sleep apnea." (Doc 20-3, at 1). On September 10, 2012, Dr. Wall provided Liberty with a signed letter confirming his medical opinion. (Doc. 20-2, at 48).

In addition to the opinions of Hershberger's treating physicians, Liberty considered

---

[5] None of the medical records reflects any actual medical treatment of Hershberger by Dr. Wall personally, but in his April 2, 2012, letter, he held himself out as Hershberger's "family physician." (Doc. 20-3, at 38).

the opinions of several consulting physicians retained as independent peer reviewers. Their assessments were based solely on a review of Hershberger's medical records and, in some cases, telephone conversation with Hershberger's treating physicians. None of the consulting physicians examined Hershberger in person.

Consulting cardiologist Dr. Bellinger prepared a report dated June 4, 2010, in which he noted that Hershberger's symptoms "occur with exhaustion, but not at rest." (Doc. 20-10, at 14). Dr. Bellinger noted his medical opinion that, from a cardiology standpoint:

> The claimant should be able to perform an occupation with the following restrictions: Sitting for eight hours per work day, with a five minute break every hour to stand and stretch, standing for brief periods only (five minutes at a time for a total of one hour in a work day), walking for brief periods only (five minutes at a time for a total of one hour in a work day), climbing one flight of stairs occasionally, lifting up to 10 pounds occasionally, carrying up to 10 pounds occasionally, pushing/pulling up to 25 pounds occasionally, bending/stooping/twisting occasionally, and unrestricted use of the upper extremities. . . . Based on the medical evidence provided, the claimant should be able to perform a full time work capacity within the supported restrictions.

(Doc. 20-10, at 14–15).

Consulting cardiologist Mark Nathan, M.D., prepared a report dated September 9, 2011, in which he noted that Hershberger was "impaired because of fatigue and exertional dyspnea," caused by a combination of medical conditions. (Doc. 20-5, at 44). Dr. Nathan further noted that: "The main specific restriction and limitation is due to his bicuspid aortic valve with dilated ascending aorta to 4.3 cm. This is an important consideration because such patients can have spontaneous aortic dissection in association with heavy lifting or strenuous exercise." (Doc. 20-5, at 45). Dr. Nathan noted his medical opinion that, from a cardiology standpoint:

> He should be restricted to occasional sedentary activity, contemplating that he could lift or carry up to 10 pounds occasionally. I believe that in his current circumstances, more than very occasionally lifting of 20 pounds would be hazardous to his health. He can sit or walk at a slow pace without restriction

or limitation. He can stand for 20 minutes at a time, once per hour. He can reach or pull up to 5 pounds occasionally.

I expect the duration of these restrictions to be indefinite. . . .

Within the restrictions described above, he should be able to sustain full-time work capacity.

(Doc. 20-5, at 45).

Consulting physician Lucien Parrillo, M.D., an internist board certified in occupational medicine, prepared a report dated February 8, 2012, in which he evaluated whether and to what extent Hershberger had any limitations from neuropathy. Dr. Parrillo concluded that, with respect to Hershberger's diagnosis of diabetic peripheral neuropathy:

> Based on the medical evidence reviewed the claimant does not have impairment secondary to neuropathy. In all the clinical notes reviewed, there is no description of how the claimant's neuropathy affects his function. In fact, on 03/03/2009 the claimant saw Dr. Michalek . . . and during the physical examination she described his deep tendon reflexes as "2+ and symmetrical, and his vibratory and cold sensation are intact." Given this, as well as the inconsistent reports of how the claimant's neuropathy impacts his life the claimant's neuropathy does not translate into any degree of impairment.
>
> Based on the medical evidence reviewed the claimant can sustain a full time work capacity without the need for restrictions and limitations.

(Doc. 20-3, at 50).

Consulting podiatrist Dr. Fox prepared a report dated September 6, 2012, in which he concluded that Dr. Marks's treatment notes "fail to document objective physical findings or electrodiagnostic testing to support the [clinical] diagnosis of peripheral neuropathy" and "fail to support the restrictions and limitations imposed by Dr. Marks." (Doc. 20-3, at 9). Dr. Fox further noted a telephone conversation he had with Dr. Marks, in which Hershberger's treating podiatrist "related that the claimant has a severe peripheral neuropathy with loss of protective sensation making it dangerous to stand or walk for long

periods of time. Initially, Dr. Marks opined that the claimant was unable to do any type of work, but during our telephone call we came to a consensus that a sedentary or light [physical demand level] would be appropriate." (Doc. 20-3, at 9).

Consulting internist Dr. Fuchs prepared a report dated September 6, 2012, in which he concluded that Hershberger's medical records supported "the diagnoses of bicuspid aortic valve, aortic insufficiency, dilated ascending aorta, small vessel coronary disease, diastolic dysfunction, hypertension, diabetes, hypercholesterolemia, sleep apnea, and diabetic peripheral neuropathy." (Doc. 20-3, at 3). Based on his review of medical records and a telephone conversation with Dr. Wall, Dr. Fuchs noted his medical opinion that:

> Dr. Keith Rice's proposed limitations on his progress note dated 4/13/12 related to the claimant's cardiac conditions are reasonable. He suggests limiting the claimant's lifting to no more than 15 lb. His pushing, pulling and lifting should also be similarly limited to 15 lb. His exertional angina and known coronary artery disease as well as his dilated aorta leads Dr. Rice to state that "I do not believe he can perform any outdoor activity or strenuous activity". This would translate to limiting the claimant from climbing and limiting his walking to 15 minutes per hour. The claimant's peripheral neuropathy would be expected to prevent the claimant from using foot controls. His use of insulin for diabetes . . . makes it prudent to prevent him from working at unprotected heights or from operating heavy machinery. The medical record does not support any functional impairment due to the claimant's sleep apnea, given it is being treated with CPAP. Moreover the claimant's diabetes, hypertension, and hypercholesterolemia are asymptomatic and would not be expected to directly cause functional impairment. No other restrictions or limitations are supported by the medical record.
>
> . . . .
>
> The medical record does not support restrictions or limitations precluding full time work.

(Doc. 20-3, at 4).

Finally, Liberty also relied upon a September 29, 2011, vocational skills report prepared by a vocational case manager employed by Liberty. The report was based on

Hershberger's documented education and work history, and Dr. Nathan's September 2011 medical opinion that Hershberger should be limited to sedentary work, with an additional limitation that Hershberger could not push or pull more than 5 pounds occasionally. (Doc. 20-5, at 36–37). The vocational case manager found three alternative entry level occupations for which Hershberger was qualified based on his physical capacity and his training, education, experience: Order Clerk, Food and Beverage; Information Clerk, Mall; and Cashier, Parking Lot. (Doc. 20-5, at 37).

Based on the foregoing medical and vocational evidence, Liberty determined that Hershberger was not disabled under the Policy's "any occupation" period of disability coverage, and therefore it terminated payment of long-term disability benefits effective March 27, 2012. (Doc. 20-3, at 40–42 (initial benefits denial letter); Doc. 20-3, at 19–22 (written request for review); Doc. 20-2, at 40–45 (denial of administrative appeal)).

### C. DISPUTED FACTS

The only fact dispute concerns whether Liberty properly credited the various consulting physicians' medical opinions over those of Hershberger's treating physicians. In particular, Hershberger contends that Liberty unreasonably rejected: (**a**) Dr. Marks's opinion that "[t]he only solution that we have come to for him is to have him cease employment," and that "there is really no job function he can perform safely without causing openings to his feet," (Doc 20-3, at 24); (**b**) Dr. Michalek's opinion that "Mr. Hershberger has multiple medical issues which do not allow him to return to work as a butcher and manager at BJ's or any other type of employment/job" due to "his diabetes mellitus, coronary artery disease, peripheral polyneuropathy, ascending aortic aneurysm, moderately severe obstructive sleep apnea," (Doc. 20-3, at 34); and (**c**) Dr. Wall's opinion

that "[d]ue to my patients poor health in my medical opinion he is fully & permanently disabled," (Doc. 20-3, at 38).

## II. PROCEDURAL HISTORY

Hershberger initiated this action by filing the complaint in this action on November 14, 2013. (Doc. 1). Liberty answered the complaint on January 14, 2014. (Doc. 6). The parties filed cross-motions for summary judgment on July 7, 2014. (Doc. 11; Doc. 14). These motions are now ripe for decision.

## III. STANDARD OF REVIEW

### A. THE ERISA STANDARD OF REVIEW

A claim challenging the termination of benefits brought under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

> Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan. There are no "magic words" determining the scope of judicial review of decisions to deny benefits, and discretionary powers may be granted expressly or implicitly. However, when a plan is ambiguous, it is construed in favor of the insured. The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies.

> *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011) (internal citations and quotation marks omitted).

In this case, there is no dispute as to the applicable standard of review. The parties agree that the plan at issue reserves discretionary authority to the plan administrator, Liberty.

> When a plan grants its administrator such discretionary authority, trust principles make a deferential standard of review appropriate, and we review a

> denial of benefits under an 'arbitrary and capricious' standard.[6] Likewise, when an administrator acts pursuant to her authority to construe the terms of the plan, or to act as a finder of facts, we also apply the arbitrary and capricious standard when reviewing those interpretations and factual findings.

*Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120–21 (3d Cir. 2012) (internal footnotes, citations, quotation marks, and alterations omitted).

"An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence[7] or erroneous as a matter of law." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011) (internal quotation marks omitted).

Finally, "[i]n determining whether an administrator abused its discretion, we must consider any structural conflict of interest as one of several factors." *Viera*, 642 F.3d at 413; *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–16 (2008); *Firestone*, 489 U.S. at 115. In this case, it is beyond dispute that such a conflict of interest exists, as Liberty "both evaluates claims for benefits and pays benefits claims." *See Glenn*, 554 U.S. at 112. The parties do appear to dispute, however, the significance or severity of the conflict in this case. *See Glenn*, 554 U.S. at 115.

### B.  THE SUMMARY JUDGMENT STANDARD OF REVIEW

Also applicable here is the standard of review pertaining to summary judgment motions. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should

---

[6] "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller*, 632 F.3d at 845 n.2. Accordingly, the terms "arbitrary and capricious" and "abuse of discretion" are often used interchangeably in Third Circuit ERISA case law. *See, e.g., Fleischer*, 679 F.3d at 121 n.2.

[7] In the ERISA context, "substantial evidence" is "defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fleischer*, 679 F.3d at 121 (internal quotation marks omitted). Moreover, "[w]hen reviewing an administrator's factual determinations, [the court may] consider only the evidence that was before the administrator when he made the decision being reviewed." *Fleischer*, 679 F.3d at 121 (internal quotation marks omitted).

be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

> *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

Thus, "when presented with cross motions for summary judgment, the Court must consider the motions separately, and view the evidence presented for each motion in the

light most favorable to the nonmoving party." *Borrell v. Bloomsburg Univ.*, __ F. Supp. 3d. ___, 2014 WL 5365322, at *11 (M.D. Pa. Oct. 21, 2014). "[E]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny [both] motions. *Quarles v. Palakovich*, 736 F. Supp. 2d 941, 946 (M.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008)).

## IV. THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Liberty has moved for summary judgment.

Under ERISA, "benefits determinations arise in many different contexts and circumstances, and, therefore, the factors to be considered will be varied and case-specific." *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009) (citing *Glenn*, 554 U.S. at 116–18). For example, "[i]n *Glenn*, factors included procedural concerns about the administrator's decision making process and structural concerns about the conflict of interest inherent in the way the ERISA-governed plan was funded." *Schwing*, 562 F.3d at 526 (citing *Glenn*, 554 U.S. at 118); *see also Engel v. Jefferson Pilot Fin. Ins. Co.*, Civil Action No 08-240 Erie, 2009 WL 3166513, at *15 n.6 (W.D. Pa. Sept. 28, 2009) (identifying other case-specific factors); *Swiger v. Hartford*, No. 08cv1387, 2009 WL 1248080, at *4 (W.D. Pa. Apr. 30, 2009) (same). "In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn*, 554 U.S. at 117.

In this case, Hershberger's challenge to the plan administrator's decision denying benefits boils down to three factors: (1) the conflict of interest inherent in Liberty's dual role as both administrator and payor of long-term disability claims; (2) the conflict or inconsistency between Liberty's determination that Hershberger was not disabled because

he was capable of performing sedentary work and the Social Security Administration's determination that he was disabled from performing even sedentary work; and (3) Liberty's rejection of medical opinions by Hershberger's treating physicians in favor of conflicting medical opinions by non-examining consulting physicians it had retained.

### A. DUAL-ROLE CONFLICT OF INTEREST

It is undisputed that there is a structural conflict of interest at issue in this case. Liberty "both determines eligibility and then also pays disability benefits." *See Swiger*, 2009 WL 1248080, at *4. The question, however, is how much weight that conflict bears in evaluating whether Liberty abused its discretion in denying disability benefits.

Generally, a conflict of interest

should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117.

Absent evidence of bias in this or other cases, or procedural irregularities beyond the two addressed in this report below, the inherent conflict that arises when an insurance company plan administrator that both determines eligibility and then pays disability benefits suggests is not strong. *See Swiger*, 2009 WL 1248080, at *4. Here, that inherent conflict is the only evidence advanced by Hershberger in support of affording greater weight to Liberty's conflict of interest. (Doc. 12, at 8–9 ("A dollar paid to [Hershberger] is a dollar loss of profits to Liberty as an insurer.")). Hershberger's argument on this point is weakened further by his concession, in the very next sentence, that Liberty hired outside peer reviewers— five

of them, to be exact — whom he suggests may have themselves been biased because they likely desired the assignment of additional peer review assignments from Liberty in the future. (Doc. 12, at 9).

On the other hand, although neither party addresses it, the fact that Liberty required Hershberger to apply for Social Security disability benefits[8] — encouraging him to argue that he was incapable of working full-time in any capacity, receiving the bulk of the benefits of his success in doing so, and then later ignoring or discounting the agency's disability finding in concluding that Hershberger could in fact do sedentary work — justifies giving some additional weight to the conflict-of-interest factor. *See Glenn*, 554 U.S. at 118 (noting that disability insurer's "seemingly inconsistent positions were both financially advantageous" to it).

Accordingly, the conflict of interest should be given some weight in evaluating whether Liberty abused its discretion in its denial of disability benefits under the Policy's "any occupation" period of coverage.

---

[8] In its response to Hershberger's statement of material facts, Liberty has disputed this, noting that the Policy itself does not *require* a covered person to seek Social Security disability benefits, but merely permits Liberty to estimate the amount of Social Security disability benefits a claimant would be entitled to if he or she applied and then deduct that amount from the claimant's gross monthly benefits payable under the Policy. (Doc. 25, at 2–3). However, the administrative record reveals that Liberty *explicitly* instructed Hershberger on March 25, 2010, that "[y]our Policy requires that you apply for Social Security Benefits, should your disability be expected to extend for twelve months." (Doc. 20-11, at 48). Moreover, the practical effect — estimating Social Security disability benefits and reducing the Policy's monthly benefit by that amount — is to compel the claimant to seek Social Security disability benefits when eligible. Under these circumstances, Liberty's position that the Policy did not require Hershberger to apply for Social Security disability benefits is untenable, even when viewing these facts in the light most favorable to Liberty in connection with Hershberger's motion for summary judgment.

B.  SOCIAL SECURITY DISABILITY DETERMINATION

The Social Security Administration determined that Hershberger was incapable of performing full-time work in any capacity, thus making him eligible for Social Security disability benefits. Hershberger contends that the SSA's finding is evidence of the arbitrary and capricious nature of Liberty's determination that he was capable of performing sedentary work on a full-time basis, and thus not eligible for disability benefits under the Policy. Such an inconsistent result can suggest procedural unreasonableness. *See Glenn*, 554 U.S. at 118 (characterizing inconsistent Social Security Administration and ERISA plan administrator determinations as "an important factor"); *Robinson v. Liberty Life Assurance Co. of Boston*, 25 F. Supp. 3d 541, 555 (M.D. Pa. 2014) ("[A]n SSA award may be considered as a factor in evaluating whether a plan administrator abused its discretion."). However, the Court notes that "a plan administrator is not bound by such ruling, particularly in light of the different eligibility standards imposed for a finding of ERISA disability versus SSA disability." *Robinson*, 25 F. Supp. 3d at 555; *see also Sollon v. Ohio Cas. Ins. Co.*, 396 F. Supp. 2d 560, 586–87 (W.D. Pa. 2005).

The only evidence with respect to the Social Security determination is an award letter stating the amount of Hershberger's monthly Social Security disability insurance benefit and the effective start date. (Doc. 20-10, at 7). Nothing else in the administrative record that was before the plan administrator explains the basis of the Social Security disability benefit award, without which it is impossible to expect Liberty to have credited it as probative evidence of disability under the terms of the Policy. "An ERISA plan administrator has no duty to conduct an investigation, but merely must make a decision based on the evidence available." *Creelman v. E.I. DuPont de Nemours & Co.*, No.

3:04CV1618, 2005 WL 2106230, at *6 n.3 (M.D. Pa. Aug. 31, 2005); *accord Sollon*, 396 F. Supp. 2d at 586; *Das v. Unum Life Ins. Co. of Am.*, No. Civ. A. 04-0971, 2005 WL 742444, at *10 (E.D. Pa. Mar. 31, 2005).

Accordingly, the inconsistent Social Security disability award should be given only slight weight in evaluating whether Liberty abused its discretion in its denial of disability benefits under the Policy's "any occupation" period of coverage.

### C.   TREATMENT OF MEDICAL EVIDENCE

Hershberger contends that Liberty unreasonably rejected medical opinions by his treating physicians that he was disabled and unable to do even a sedentary work, and improperly credited the opinions of several consulting physicians over those of his treating physicians.

As the Supreme Court of the United States has held, ERISA plan administrators

> may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But . . . courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003); *see also Klaassen v. Allstate Cafeteria Plan*, 637 F. Supp. 2d 272, 280 (M.D. Pa. 2007).

### 1.   Dr. Marks's Opinion

Shortly after Liberty denied continuing disability benefits to Hershberger under the Policy's "any occupation" standard, in April 2012, Dr. Marks (Hershberger's treating podiatrist) opined, with respect to Hershberger's peripheral neuropathy and the resultant recurring injuries to his feet, that "[t]he only solution that we have come to for him is to have him cease employment," and that "there is really no job function he can perform safely without causing openings to his feet." (Doc. 20-3, at 24). However, when subsequently

contacted in August 2012 by consulting podiatrist Dr. Fox, Dr. Marks revisited his opinion and agreed with Dr. Fox that Hershberger was capable of performing sedentary work. (Doc. 20-3, at 9).

Based on the assessment of consulting podiatrist Dr. Fox that Hershberger was capable of performing sedentary work from a podiatric perspective, and Dr. Marks's concession that Hershberger could perform sedentary or light work, it was not unreasonable or an abuse of discretion for Liberty to have discounted Dr. Marks's original, categorical opinion that Hershberger was incapable of working at all in favor of Dr. Fox's and Dr. Marks's later, consensus opinion that he could in fact do sedentary or light work.

### 2.  Dr. Michalek's Opinion

Dr. Michalek initially opined in March 2010 that Hershberger was limited to sedentary work by a combination of conditions — severe obstructive sleep apnea, obesity, severe peripheral polyneuropathy, and an ulcer on a toe on his left foot. (Doc. 20-12, at 46). Shortly after Liberty had denied continuing disability benefits to Hershberger under the Policy's "any occupation" standard, his treating neurologist, Dr. Michalek, opined in March 2012 that Hershberger "has multiple medical issues" — "diabetes mellitus, coronary artery disease, peripheral polyneuropathy, ascending aortic aneurysm, [and] moderately severe obstructive sleep apnea" — "which do not allow him to return to work as a butcher and manager at BJ's or any other type of employment/job." (Doc. 20-3, at 34).

With respect to his cardiac conditions, Hershberger's treating cardiologist, Dr. Rice, the consulting cardiologists retained by Liberty, Dr. Bellinger and Dr. Nathan, and the consulting internist retained by Liberty, Dr. Fuchs, all agreed that Hershberger was capable of performing sedentary work. (Doc. 20-10, at 14; Doc. 20-9, at 16; Doc. 20-3, at 28; Doc.

20-3, at 26; Doc. 20-10, at 14–15; Doc. 20-5, at 45; Doc. 20-3, at 4). With respect to his peripheral neuropathy and related foot problems, his treating podiatrist, Dr. Marks, and the consulting podiatrist retained by Liberty, Dr. Fox, agreed that Hershberger was capable of performing sedentary work. (Doc. 20-3, at 9). With respect to his diabetes and sleep apnea conditions, Dr. Fuchs concluded that: "The medical record does not support any functional impairment due to the claimant's sleep apnea, given it is being treated with CPAP. Moreover, the claimant's diabetes . . . [is] asymptomatic and would not be expected to directly cause functional impairment." (Doc. 20-3, at 4).

Dr. Michalek was Hershberger's treating physician with respect to his sleep apnea condition. Her contemporaneous treatment notes indicate that Hershberger was responding "very well to CPAP therapy" and that his sleep apnea condition was "dramatically improved" with it. (Doc. 20-9, at 38–39; Doc. 20-10, at 26–27; Doc. 20-9, at 37). One year after he began CPAP therapy, Dr. Michalek opined that Hershberger was capable of performing sedentary work. (Doc. 20-12, at 46). Two years later, shortly after Liberty denied continuing disability benefits to Hershberger under the Policy's "any occupation" standard, she changed her opinion, stating that he now was incapable of "any other type of employment/job." (Doc. 20-3, at 34). Hershberger's medical records do not document any intervening decline in his condition with respect to sleep apnea, and neither her March 2012 letter nor her treatment notes explain why Dr. Michalek's earlier opinion that Hershberger was able to do sedentary work had changed an opinion that he was completely unable to work. Under these circumstances, it was not an abuse of discretion for Liberty to credit the opinions of its consulting physicians, as well as Hershberger's other treating physicians, over that of Dr. Michalek. *See Abnathya v. Hoffman-La Roche, Inc.*, 2 F.3d 40, 47–48 (3d Cir. 1993)

(holding administrator did not abuse its discretion in deferring to the opinions of two consulting physicians over conclusory opinion of treating physician that claimant was "disabled"); *Neptune v. Sun Life Assurance Co. of Canada*, Civil Action No. 10-cv-2938, 2013 WL 5273785, at *12 (E.D. Pa. Sept. 16, 2013) (holding that administrator had full discretion to credit opinions of consulting physicians over treating physicians' opinions that claimant was now unable to work when treating physicians had previously cleared claimant to work and provided no reason for change of opinion). Moreover, it was reasonable for Liberty to discount her opinion given that Dr. Michalek neither provided an adequate explanation for her opinion nor made a reasonable effort to return the several phone calls from Dr. Fuchs, Dr. Parrillo, and Dr. Nathan when they sought to discuss Hershberger's medical condition with her. *See Gibson v. Hartford Life & Accident Ins. Co.*, Civil Action No. 2:06-CV-3814-LDD, 2007 WL 1892486, at *13 (E.D. Pa. June 29, 2007).

### 3.   Dr. Wall's Opinion

Shortly after Liberty had denied continuing disability benefits to Hershberger under the Policy's "any occupation" standard, his treating physician, Dr. Wall, opined in April 2012 that "[d]ue to my patient's poor health in my medical opinion he is fully & permanently disabled." (Doc. 20-3, at 38). Dr. Wall's April 2012 listed Hershberger's various medical conditions and noted that he "fatigues easily & continues to get chest pain at times," but it did not describe any actual limitations or restrictions to support his otherwise conclusory opinion that Hershberger was disabled. (Doc. 20-3, at 38). It was not an abuse of discretion for Liberty to credit the opinions of its consulting physicians, as well as Hershberger's other treating physicians, over Dr. Wall's conclusory April 2012 opinion. *See Abnathya*, 2 F.3d at 47–48.

When subsequently contacted in August 2012 by consulting physician Dr. Fuchs, Dr. Wall expressed his opinion that Hershberger "could [not] return to work even at a sedentary level. . . . [Hershberger] could not sit for a prolonged period of time because of his lower extremity edema and that he could not concentrate because of fatigue caused by his sleep apnea." (Doc. 20-3, at 1). In September 2012, Dr. Wall provided Liberty with a signed letter reiterating this medical opinion. (Doc. 20-2, at 48). Based on his review of medical records and conversation with Dr. Wall, Dr. Fuchs subsequently provided a written report, in which he opined that: "The medical record does not support any functional impairment due to claimant's sleep apnea, given it is being treated with CPAP. . . . The medical record does not support restrictions or limitations precluding full time work." (Doc. 20-3, at 4).

As Dr. Fuchs noted in his report, the restrictions or limitations upon which Dr. Wall's opinion rested — lower extremity edema that prevented Hershberger from sitting for prolonged periods of time and an inability to concentrate caused by fatigue as a result of his sleep apnea — were not supported by the medical records submitted to Liberty for review. With respect to his sleep apnea, Hershberger's treating neurologist, Dr. Michalek, reported within months after starting treatment that he responded "very well to CPAP therapy" and his sleep apnea condition was "dramatically improved" with it. (Doc. 20-9, at 38–39; Doc. 20-10, at 26–27; Doc. 20-9, at 37). His primary care physician, Dr. Matsko (Dr. Wall's predecessor) noted in March 2010 that Hershberger's sleep apnea was "under reasonable control as long as he uses CPAP machine." (Doc. 20-10, at 47). One year after starting CPAP therapy, Dr. Michalek opined that Hershberger was capable of performing sedentary work. (Doc. 20-12, at 46). None of his medical records submitted for Liberty's review indicate a decline in his sleep apnea condition, nor do they reflect any reported or observed

fatigue or difficulty with concentration, other than fatigue associated with Hershberger's cardiac conditions. Moreover, all medical records documenting any clinical observation of Hershberger's lower extremities for edema describe only "1+," "trace," "trivial," or no lower extremity edema. (Doc. 20-10, at 28; Doc. 20-12, at 13; Doc. 20-8, at 8; Doc. 20-8, at 17; Doc. 20-9, at 11; Doc. 20-9, at 29; Doc. 20-8, at 20; Doc. 20-9, at 14; Doc. 20-9, at 31; Doc. 20-6, at 13; Doc. 20-5, at 3; Doc. 20-8, at 24; Doc. 20-4, at 46; Doc. 20-4, at 15; Doc. 20-4, at 12; Doc. 20-3, at 30; Doc. 20-5, at 5; Doc. 20-3, at 28; Doc. 20-3, at 37; Doc. 20-3, at 26).

### 4.   Conclusion as to Treatment of Medical Evidence

Hershberger has argued that Liberty's rejection of medical opinions by treating physicians Dr. Marks, Dr. Michalek, and Dr. Wall in favor of conflicting medical opinions by non-examining consulting physicians retained by Liberty constitutes a procedural concern about the administrator's decision-making process. However, based on the foregoing, it was reasonable for Liberty to credit the conflicting opinions of these consulting physicians and Hershberger's other treating physicians — as well as Dr. Marks's later-expressed opinion and Dr. Michalek's earlier-expressed opinion that Hershberger could perform sedentary work — over Dr. Marks's April 2012 opinion, Dr. Michalek's April 2012 opinion, and Dr. Wall's August and September 2012 opinions. As a consequence, the procedural-concerns factor weighs significantly in favor of Liberty.

### D.   Weighing the Factors

To decide whether Liberty's determination was arbitrary and capricious, the Court must consider the case-specific factors and reach a result by weighing all of them together. *See Miller*, 632 F.3d at 855 (citing *Glenn*, 554 U.S. at 117). Here, the conflict-of-interest factor is given some weight, as Liberty is responsible for both benefit determinations and payment

of benefits, and as its disability determination under the Policy was inconsistent with the Social Security Administration's determination that Hershberger was disabled under the Social Security Act. The inconsistent disability determinations by the Liberty and the Social Security Administration are considered as evidence of procedural unreasonableness and given slight weight, largely because the only evidence with respect to the Social Security determination is a summary award letter. Liberty's treatment of medical opinion evidence is given significant weight, as Liberty appears to have reasonably rejected the April 2012 medical opinion by Dr. Marks, the April 2012 medical opinion by Dr. Michalek, and the August and September 2012 medical opinions by Dr. Wall with respect to Hershberger's ability to perform sedentary work, crediting other opinions advanced by other treating and consulting physicians, as well as other conflicting opinions provided by these same treating physicians at other times.

In sum, and for the foregoing reasons, having viewed the entirety of the evidence in the record in the light most favorable to Hershberger, the non-moving party, the undersigned finds that the disability determination by Liberty in this case was reasonable and not an abuse of discretion. Accordingly, it is recommended that Liberty's motion for summary judgment (Doc. 14) be granted.

## V.   The Plaintiff's Motion for Summary Judgment

Hershberger has likewise moved for summary judgment.

Based on the foregoing discussion, and viewing the record in the light most favorable to Liberty, the non-moving party, the undersigned finds that the disability determination by Liberty in this case was reasonable and not an abuse of discretion. Accordingly, it is recommended that Hershberger's motion for summary judgment (Doc. 11) be denied.

## VI. Recommendation

Based on the foregoing, it is recommended that:

1. The Defendant's motion for summary judgment (Doc. 14) be **GRANTED**;

2. The Plaintiff's motion for summary judgment (Doc. 11) be **DENIED**; and

3. Final judgment be entered in favor of the Defendant.


**BY THE COURT:**

**Dated: April 3, 2015**                 *s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

TERRY HERSHBERGER,

                Plaintiff,

      v.

LIBERTY LIFE ASSURANCE OF
BOSTON,

                Defendant.

CIVIL ACTION NO. 1:13-CV-02795

(KANE, J.)
(MEHALCHICK, M.J.)

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **April 3, 2015**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: April 3, 2015**

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**